# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA
# ANDERSON/GREENWOOD DIVISION

| | |
|---|---|
| Joyce Ann Pitts, ) | Civil Action No. 8:15-cv-01988-JMC |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **ORDER AND OPINION** |
| ) | |
| SCANA Corporation Health and Welfare ) | |
| Plan, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

This matter is before the court for review of the decision by Defendant SCANA Corporation Health and Welfare Plan ("Defendant"), through its third-party administrator, Reed Group Ltd. ("Reed Group"), to deny a claim by Plaintiff Joyce Ann Pitts ("Plaintiff") for long term disability ("LTD") benefits under Defendant's health insurance plan (the "Plan"), which is governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001–1461 ("ERISA"). Plaintiff seeks an order awarding her LTD benefits under the Plan, pursuant to 29 U.S.C. § 1132(a), and attorney's fees and costs, pursuant to 29 U.S.C. § 1132(g). The parties have filed a joint stipulation and memoranda in support of judgment pursuant to the court's Specialized Case Management Order for ERISA benefits cases. The matter came before the court for a hearing on October 11, 2016. For the reasons set forth below, the court affirms Defendant's denial of Plaintiff's LTD claim and declines to award Plaintiff attorney's fees and costs.

## I. RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff's claim arises under the Plan, a policy of group insurance to provide disability benefits to Defendant's employees who chose to participate. (*See* ECF No. 17-4.) There appears to be no dispute that Plaintiff was covered by the Plan. Under the terms of the Plan, "[i]n order for

1

[a covered employee] to qualify for LTD Benefits, [the employee] must be under the care of a Physician who must certify that [the employee's] medical condition has rendered [her] Disabled, and [the employee] must apply and be approved for LTD Benefits." (*Id.* at 27.) The term "Disabled" means, in relevant portion, that the employee is "receiving appropriate care and treatment from a Physician due to a medical condition related to an illness, injury or accident that permanently prevents [the employee] from performing one or more of the material and substantial duties of [the employee's] own occupation." (*Id.*) Importantly, the term "permanently" is not defined by the Plan. The Plan also provides that employees "may be asked to re-certify that [they] continue to be eligible for LTD Benefits as often as is deemed necessary by the Plan Administrator" and "at least every two years." (*Id.* at 27, 30.)

The Plan grants discretionary authority to the SCANA Corporation Long-Term Disability Plan Initial Review Committee ("LTD Committee") and Appeals Committee ("Appeals Committee") to interpret the terms of the Plan and make benefit determinations under the Plan. (*Id.* at 10-11, 29, 31-32, 35-39.) Defendant entered into an administrative services agreement with Reed Group, under which Reed Group provided case management and administrative services with respect to LTD benefits under the Plan. (*Id.* at 33.)

Plaintiff claimed short disability ("STD") benefits based on lower back and elbow pain. On July 12, 2012, Defendant approved Plaintiff's claim with on onset date of June 25, 2012, and extended her STD benefits until December 26, 2012. (*See* ECF No. 17-1 at 59, 74, 87; ECF No. 17-3 at 57.) The approval of the STD benefits were grounded largely on the following medical evidence.

On July 9, 2012, Plaintiff was examined by her primary physician Doctor Benjamin C. Pinner ("Dr. Pinner") and was diagnosed with "low back pain" and "tennis elbow." (ECF No. 17-

2

1 at 51.) The statement from the examination asks, "[h]as the patient been totally unable to work?" (*Id.*) Dr. Pinner checked "yes," wrote that Plaintiff was "unable to work," stated the inability was from June 25, 2012 to August 6, 2012, and estimated that Plaintiff would return to work on August 8, 2012. (*Id.*)

On July 31, 2012, Dr. Pinner completed the first of three history and physical reports for Plaintiff, noting that he would need to determine whether Plaintiff needed stronger pain medication. (*Id.* at 73.) On August 2, 2012, for the second report, Dr. Pinner noted that Plaintiff's condition was "[p]ersistent, actually progressing. No relief from her first injection. She is still unable to work." (*Id.* at 72.) On August 13, 2012, for the third report, Dr. Pinner noted that Plaintiff was "[i]mproving today," and that he would "need to taper pain medication before she can return to work. Will plan to return to work on [Septmber 10, 2012]." (*Id.* at 70.) In response to a questionnaire from Reed Group sent on August 8, 2012, Dr. Pinner stated that Plaintiff was diagnosed with lumbago and lumbosacral disc disease, that she was absent from work from June 25, 2012, to September 10, 2012 and that her estimated return-to-work date was September 10, 2012. (*Id.* at 66.)

In August 2012, Plaintiff made four visits to physicians with Moore Orthopaedics, which resulted in several brief medical reports focusing on Plaintiff's lower back pain. (*See Id.* 78-83.) In response to a questionnaire from Reed Group sent on August 24, 2012, Doctor Michael W. Peelle ("Dr. Peelle") stated that Plaintiff was diagnosed with sacroilitis and facet syndrome. In response to questions regarding whether Plaintiff had been absent from work, the dates of any absences, an expected return-to-work date, and whether any restriction or accommodations were required, Dr. Peelle answered all with "N/A." (*Id.* at 77.)

On September 10, 2012, Dr. Pinner completed and submitted a return to work form from Reed Group. (*Id.* at 86.) He stated that Plaintiff was medically fit to return to work on September 10, 2012, but that her medical condition would continue to impact her ability to perform the essential functions of her job. (*Id.*) Dr. Pinner stated that Plaintiff was restricted to sedentary work, frequently sitting; occasionally standing, walking, driving, grasping, and reaching; and never bending, twisting, squatting, climbing, pushing, or pulling. (*Id.*)

In October 2012, Dr. Pinner completed another three history and physical reports based on Plaintiff's visits. In the October 4 report, Dr. Pinner noted that her condition was unchanged, that she had returned to physical therapy, that she had not returned to work as there were no light duties available, and that he may need to consider a functional assessment for her. (ECF No. 17-2 at 27-28.) In the October 23 report, Dr. Pinner noted that Plaintiff still could not return to work, that he anticipated that she might return to work in a month, and that, if she did not improve in a month, he would contact Defendant regarding a functional assessment test. (*Id.* at 25.) In response to a questionnaire, Dr. Pinner informed Reed Group that Plaintiff would be absent from work until November 23, 2012, on which date he estimated that Plaintiff could return to work. (*Id.* at 21.) In another statement, apparently submitted to Reed Group around the same time, Dr. Pinner again stated that he estimated that Plaintiff could return to work on November 23, 2012. (*Id.* at 31.)

Also in October 2012, Reed Group sent Dr. Peelle a questionnaire regarding Plaintiff's status. (*Id.* at 12, 34.) After examining Plaintiff on October 1 and October 24, Dr. Peelle and his colleague, Doctor David B. Fulton, noted that Plaintiff's symptoms had not improved despite treatment. (*Id.* at 35-37.) In his statement submitted to Reed Group on October 24, 2016, Dr. Peelle stated that he estimated that Plaintiff could return to work on November 2, 2012. (*Id.* at 32.)

4

In November and December of 2012, Dr. Pinner completed another three history and physical reports based on Plaintiff's visits. In his November 23 report, Dr. Pinner noted that Plaintiff had only minimally improved despite therapy and that he would contact Reed Group to discuss functional capacity testing. (*Id.* at 84.) In his December 6 report, Dr. Pinner noted that he would arrange functional assessment testing with MedFit, that he would extend Plaintiff's STD excuse until January 4, 2013, and that he would determine her disability based on MedFit's functional assessment testing. (*Id.* at 80.) In a statement submitted to Reed Group on December 11, 2012, Dr. Pinner stated that Plaintiff had been "totally unable to work" from June 25, 2012, to January 4, 2013, and that he expected Plaintiff could return to work on January 4, 2013. (*Id.* at 72.) On the same day, Dr. Pinner completed and submitted a form sent to him by Reed Group regarding Plaintiff's potential LTD. (*Id.* at 74-75.) Dr. Pinner did not fill out the requested information because Plaintiff was "scheduled for testing," and he would "determine disability once results are received." (*Id.*)

On December 28, 2012, Plaintiff submitted to Reed Group an application for LTD benefits. (ECF No. 17-3 at 8-12.)

MedFit completed its functional assessment testing on December 28, 2012. (*Id.* at 20-33.) After numerous tests, MedFit concluded that Plaintiff's "return-to-work status" was to receive "further treatment." (*Id.* at 33.) In its summary, MedFit stated that Plaintiff had a "decrease in functional status," that, as part of her physical therapy goals, Plaintiff would "be able to perform work related tasks with no more than minimum difficulty in order to return to work within 10 weeks," and that the "potential to reach [this] goal[]" was "good." (*Id.* at 21.) After reviewing the MedFit report, Dr. Pinner stated that he had "no revisions to this plan of care" and that Plaintiff's prognosis was excellent. (*Id.*)

5

On January 4, 2013, Dr. Pinner completed another Reed Group LTD statement. (*Id.* at 17-18.) He marked boxes stating that Plaintiff "is . . . now totally disabled," that he "expects a fundamental or marked change in the future," that Plaintiff would "recover sufficiently to perform [her] duties" in one to three months after "10 weeks of therapy," and that Plaintiff was not "permanently disabled." (*Id.* at 18.) He again stated that Plaintiff was scheduled for functional testing and that he would determine her disability after results were received.[1] (*Id.*) On January 7, 2013, Dr. Pinner completed a form sent to him by Reed Group. (*Id.* at 54-56.) Asked whether Plaintiff is "[p]ermanently disabled," Dr. Pinner wrote "yes." (*Id.* at 54.) Asked whether Plaintiff had reached "Maximum Medical Improvement (MMI)," Dr. Pinner wrote "no," and wrote that he would be "able to make a determination" by February 19, 2013. (*Id.*) He also stated that Plaintiff "may [r]eturn to [w]ork with [n]o [l]imitations effective [February 19, 2013]." (*Id.* at 56.) Asked whether Plaintiff could perform no work, sedentary work, light work, medium work, or heavy work, Dr. Pinner replied that she could perform "[n]o [w]ork – [n]ot capable of gainful employment at this time." (*Id.* at 55.) Having noted no other work restriction (*see id.* at 55-56), Dr. Pinner stated that the duration of the restriction was ten weeks and would be complete on February 19, 2013 (*id.* at 55.)

On February 20, 2013, an initial LTD case review was completed by Donna Cruz, LPN. (*Id.* at 58-59). Cruz noted that, per Dr. Pinner, Plaintiff's primary physician, Plaintiff is permanently disabled, but she also noted that Dr. Pinner expected Plaintiff to be able to return to work on February 19, 2013. (*Id.* at 59.) Cruz explained that her attempts to have Dr. Pinner clarify his opinion were ineffective. (*Id.*) Cruz concluded that, although the evidence "supports that [Plaintiff] is currently incapable of performing her job duties[,] it does not support that her

---

[1] It is not clear from the record why Dr. Pinner stated he was awaiting the MedFit functional assessment testing report, when he had received it earlier.

6

condition will permanently prevent her from performing her job." (*Id.*) Accordingly, Cruz recommended that Reed Group deny the LTD claim. (*Id.*)

On February 20, 2013, the LTD Committee denied Plaintiff's claim for LTD benefits. (*Id.* at 60-61.) In its explanation of the decision to Plaintiff, the LTD Committee stated that "[w]hile the documentation received supports that you are currently incapable of performing your job duties, it does not support that your condition will permanently prevent you from performing your job. While your treating physician indicated a permanent disability, he has also advised that he anticipates you will be able to resume work activities . . . ." (*Id.* at 63.) Plaintiff appealed the LTD Committee's decision on March 11, 2013. (*Id.* at 68.) On May 9, 2013, the Appeals Committee upheld the LTD Committee's decision. (*Id.* at 85.) In its explanation, the Appeals Committee noted that "no additional information was provided in the appeal process," and that "[t]he permanency of her condition has not been established[, as] Dr. Pinner was of the opinion that [Plaintiff] could return to [w]ork in February 2013." (*Id.* at 84.)

Plaintiff filed the instant action in state court on April 9, 2015, and Defendant filed a notice of removal to this court on May 12, 2015. (ECF No. 1.) The parties filed their joint stipulation and memoranda in support of judgment on September 8, 2015. (ECF Nos. 16, 17, 18.) The parties filed replies to each other's memoranda on September 15, 2015. (ECF Nos. 19, 20.)

## II. LEGAL STANDARD AND ANALYSIS

**A. LTD Claim**

The parties agree that Defendant's denial of Plaintiff's claim should be reviewed for abuse of discretion because the Plan grants the LTD and Appeals Committees the right to interpret and apply the Plan's terms and provides that decisions whether to grant or deny claims is within the Committees' discretion. (ECF No. 17 at 2); *see Woods v. Prudential Ins. Co.*, 528 F.3d 320, 322

7

("[If]the benefit plan gives the administrator or fiduciary *discretionary* authority to determine eligibility for benefits or to construe the terms of the plan . . . , the courts' review is for abuse of discretion." (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). The parties dispute, however, what this standard of review requires. Defendant argues that the court should ask whether Defendant's decision was arbitrary or capricious. (ECF No. 16 at 6.) Plaintiff, on the other hand, seeks a less deferential standard, arguing that the court should ask whether the decision was reasonable, meaning that it is the result of a deliberate, principled reasoning process and is supported by substantial evidence. (ECF No. 18 at 3.) The court declines to decide the matter because, even under the standard Plaintiff proposes, the denial of LTD benefits should be affirmed.

Where a plan administrator's decision is reasonable, the court should not disturb the benefits decision in substitution of its own judgment. *See Sheppard & Enoch Pratt Hosp., Inc. v. Travelers Ins. Co.*, 32 F.3d 120, 125 (4th Cir. 1994). "Under the abuse of discretion standard, the plan administrator's decision is reasonable if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Bernstein v. CapitalCare, Inc.*, 70 F.3d 783, 788 (4th Cir. 1995) (internal quotation marks and citation omitted). Substantial evidence is "more than a mere scintilla" and is "[s]pecifically, . . . such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidation Coal Co. v. Williams*, 453 F.3d 609, 614–15 (4th Cir. 2006) (citations omitted).

To determine the reasonableness of an administrator's discretionary decision, the Fourth Circuit has held that a court may consider a non-exhaustive list of factors:

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any

8

external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

*Booth v. Wal–Mart Stores, Inc. Assocs. Health & Welfare Plan*, 201 F.3d 335, 342–43 (4th Cir. 2000). "All eight *Booth* factors need not be," and might not be, "in play" in a given case.[2] *Helton v. AT & T, Inc.*, 709 F.3d 343, 357 (4th Cir. 2013).

Here, it appears that only four of the *Booth* factors are in play, namely (1) the language of the plan, (2) the degree to which the materials considered to make the decision support it, (3) whether the fiduciary's interpretation was consistent with other provisions in the plan, and (4) whether the decisionmaking process was reasoned and principled. A review of the relevant *Booth* factors in this case leads the court to conclude that Defendant did not abuse its discretion.

**1. The language of the Plan**

As a general rule, when, as here, a plan confers discretion on an administrator to interpret the plan's terms, a court will defer to the administrator's interpretation so long as it is reasonable. *See Colucci v. Agfa Corp Severance Pay Plan*, 431 F.3d 170, 176 (4th Cir. 2005), *abrogated on other grounds by Champion v. Black & Decker (U.S.), Inc.,* 550 F.3d 353 (4th Cir. 2008). Thus, an administrator's choice between multiple reasonable interpretations of an ambiguous term will

---

[2] In an unpublished opinion, the Fourth Circuit explained that it has expressed the reasonableness inquiry in different terminology:

> A reasonable decision is the result of a deliberate, principled reasoning process and is supported by substantial evidence. . . . This court has alternatively framed reasonableness as an open-ended inquiry that may, in addition to other relevant issues, consider [*Booth*'s] eight factors. . . . We have never explicitly overruled *Booth*'s facially more expansive test of reasonableness. Recent decisions have embraced both standards. We reconcile the two lines of cases by viewing the *Booth* factors as more particularized statements of the elements that constitute a deliberate, principled reasoning process and substantial evidence . . . .

*Donnell v. Metro. Life Ins. Co.,* 165 Fed. App'x 288, 294 & n.6 (4th Cir. 2006). (internal citations omitted).

9

be upheld, but an administrator may not use its interpretative authority "to alter the terms of the plan or to construe unambiguous terms other than as written." *Id.*

Here, an employee qualifies for LTD benefits under the Plan if (1) she is "under the care of a Physician;" (2) the Physician "certif[ies] that [her] medical condition has rendered her Disabled;" and (3) she applies for LTD benefits. (ECF No. 17-4 at 27.) There is no dispute as to the meaning of the first and third elements or that Plaintiff met them. Rather, the dispute centers on the meaning of the second element, specifically the meaning of "Disabled." That term is defined by the Plan to refer to (1) an employee who is "receiving appropriate care and treatment from a Physician; (2) the receipt of that care and treatment is "due to a medical condition related to an illness, injury or accident;" (3) the condition "permanently prevents [the employee] from performing one or more of the material and substantial duties"; and (4) the duties are those of the employee's "own occupation." (*Id.*) Again, there is no dispute as to the meaning of the first, second, and fourth of these sub-elements or that Plaintiff has met them. The only dispute is focused on the meaning of the third element, specifically the meaning of the word "permanently." The word is not defined in the Plan.

When a term "is undefined in the plan, it must be accorded its plain and ordinary meaning . . . [and] must [be] examine[d] . . . in the context in which it is used." *Ahuja v. Ericsson, Inc.*, 277 F. App'x 300, 303 (4th Cir. 2008). And, as explained previously, if the meaning of the undefined term is doubtful or ambiguous, "'the [plan administrator]'s interpretation will not be disturbed if reasonable'" *Carden v. Aetna Life Ins. Co.*, 559 F.3d 256, 261 (4th Cir. 2009) (quoting *Firestone*, 489 U.S. at 111).

Although they did not expressly define "permanently," the LTD and Appeals Committee appear to have determined that a medical condition cannot be understood to permanently prevent

10

an employee from performing her duties if the physician determines that the employee will be able to return to work within several months of the LTD application. This *sub silentio* interpretation is apparent from the LTD and Appeals Committees' stated reason for denying LTD benefits, namely that, although Plaintiff was currently disabled, there was insufficient evidence that Plaintiff was permanently disabled because Dr. Pinner opined that Plaintiff could return to work on February 19, 2013. (*See* ECF No. 17-3 at 63, 84.) Defendant thus concluded that proof of a disability that currently precludes work but will not preclude work in the near future is not proof of a disability that permanently precludes work.

The court concludes that Defendant's interpretation accords with the plain and ordinary meaning of "permanently," and, even if the meaning of the word were ambiguous, the court concludes that the interpretation chosen by Defendant is not unreasonable. "Permanently" is the adverbial form of the adjective "permanent," which means, as relevant here, "continuing or enduring without fundamental or marked change: stable. *Merriam-Webster's Collegiate Dictionary*, http://unabridged.merriam-webster.com/collegiate/permanently (last accessed Oct. 13, 2016), Defendant's interpretation of the Plan provision accords with this plain and ordinary understanding of the word because it requires an employee's preclusion from work to continue without fundamental or marked change and to last for a long time rather than temporarily. Further, even if the term "permanently" were ambiguous as used in the Plan provision, Defendant's interpretation, which requires that an employee's preclusion from work be continuing and lasting rather than subject to change and short-lived is not an unreasonable interpretation, given the meaning ordinarily ascribed to the word.

Plaintiff argues that Defendant's interpretation of "permanently" is unreasonable for two reasons. First, she contends that "[t]he Plan unambiguously provides that once an employee

11

becomes disabled, she is entitled to LTD benefits." (ECF No. 18 at 8.) As far as Plaintiff is concerned, the language of the Plan provides that, once a physician determines that an employee is unable to perform her job duties, that is the end of the matter. (*Id.* at 8-9.) The court concludes, however, that Defendant's interpretation to the contrary is not unreasonable. Plaintiff's interpretation appears to focus solely on the qualification provision of the Plan, which, indeed, only requires a physician to determine that a medical condition renders the employee disabled. But it ignores the Plan's definition of "disabled," which includes, as a sub-element, that the medical condition *permanently* prevent the employee from performing her job duties. Rather than accord "permanently" a different meaning than the one employed by Defendant, Plaintiff's interpretation gives "permanently" no meaning at all, as it reads the word out of the provision. If an employee qualified for LTD benefits upon any determination by a physician that she was unable to perform her job duties, then any such determination—regardless whether the inability to perform the duties was permanent—would suffice. This reading contradicts the plain language of the Plan, and it was not unreasonable for Defendant to reject it. *See Wheeler v. Dynamic Eng'g, Inc.*, 62 F.3d 634, 638 (4th Cir. 1995) ("[Courts] interpret an ERISA health insurance plan under ordinary principles of contract law, enforcing the plan's plain language in its ordinary sense.")

Second, Plaintiff contends that Defendant's interpretation is unreasonable because it does not allow for a physician's determination that an employee is totally disabled to satisfy the requirement that the employee be permanently disabled. In Plaintiff's view, "[t]otally disabled and permanently disabled are synonymous." (ECF No. 20 at 2.) Moreover, because "[d]octors are not lawyers," a physician's determination that an employee is totally disabled should equate to a determination that she is permanently disabled. (*Id.*) As with Plaintiff's first contention, the court concludes that Defendant's interpretation—which implicitly views total inability to perform one's

12

job duties as not synonymous with permanent inability to do so—is not unreasonable. "Total," as relevant here, means "comprising or constituting a whole: entire." *Merriam-Webster's Collegiate Dictionary*, http://unabridged.merriam-webster.com/collegiate/total (last accessed Oct. 13, 2016). In their plain an ordinary meanings then, the words are not synonymous: one refers to a thing's completeness, while the other refers to a thing's duration. The presence of the former quality has no bearing on the presence of the latter quality. In other words, an employee's inability to perform job duties may be total, *i.e.*, she cannot complete the most infinitesimal task due to a sudden seizure, but not permanent, *i.e.*, the effects of the seizure pass after a few days. Similarly, an employee's inability to perform job duties may be permanent, *i.e.*, her condition prevents her from ever again sitting for over three hours, but not total, *i.e.*, she can still sit for up to three hours. The plain, ordinary meaning of "permanent" is simply not encapsulated in the word "total," and Defendant was not required to interpret "permanent" as if it were synonymous with "total." Moreover, to whatever extent the relationship between the meaning of "permanent" and the meaning of "total" is ambiguous, it was not unreasonable for Defendant to interpret "permanent" in such a way that it is not viewed as synonymous with "total."

The court fails to see the relevance of Plaintiff's argument that doctors are not lawyers. The Plan requires an employee to produce evidence that a medical condition permanently prevents her from performing her job duties. In the normal case, such evidence will include a physician's opinion whether the employee's condition precludes performance of job duties and whether it does so permanently. A physician might opine as to the completeness of an employee's inability to perform job functions and might not opine as to the duration of that inability. A plan, as interpreted by a plan administrator, may define LTD in such a way that a physician's opinion as to the completeness of such an inability is of no moment because it does not provide any indication as to

13

the inability's duration. In none of this does it matter whether the physician is legally-trained. Here, the mere fact that the Plan contemplates that non-legally-trained physicians will opine as to the permanence of an inability to perform job functions does not necessitate an interpretation of "permanently" beyond its plain and ordinary meaning.

In sum, the only dispute over the Plan's language involves Defendant's interpretation of the term "permanently." Because Defendant's interpretation—which requires evidence that the inability to perform job functions last more than several months—is not unreasonable, this first *Booth* factor favors Defendant.

### 2. The degree to which the materials considered to make the decision support it

The conclusion above that Defendant's interpretation of "permanently" was not unreasonable compels the court's conclusion that the materials Defendant considered sufficiently supports its decision to deny Plaintiff's LTD claim. Most of Plaintiff's arguments in her memorandum discount the need to demonstrate the lasting or continuous duration of her inability to perform job functions. (*See* ECF No. 18 at 8-10.) However, as explained above, it was not unreasonable for Defendant to consider what the evidence presented by Plaintiff's declared about her disability's permanence.

The evidence adduced by Plaintiff indisputably showed that Plaintiff was temporarily disabled from June 25, 2012, to December 26, 2013. Most of the evidence to which Plaintiff points in her memorandum is aimed at proving this uncontested point. (*See id.* at 5-7.) Dr. Peelle's reports did not offer any opinion as to whether Plaintiff's disability was permanent. The MedFit report, to the extent it is indicative of permanence, supports Defendant's determination that Plaintiff's disability would be of short duration. (*See, e.g.*, ECF No. 17-3 at 21) (suggesting Plaintiff would be able to return to work in 10 weeks). Aside from the MedFit report, the only other evidence

14

regarding permanence from a treating physician is Dr. Pinner's last two reports sent to Reed Group. In the January 4, 2013 report, Dr. Pinner stated that Plaintiff was not permanently disabled, that, although she was then totally disabled, he expected her to make a fundamental or marked change after 10 weeks of therapy and recover sufficiently to perform her duties. (*Id.* at 17-18.) The January 7, 2013 report should have been Dr. Pinner's clearest explanation regarding permanence because he was in receipt of the MedFit report, for which his permanence findings had been delayed. However, this last report is the most inconsistent and ambiguous. Dr. Pinner stated that Plaintiff was permanently disabled, but he also stated (1) that her MMI had not been reached and that a determination as to MMI would not be reached until February 19, 2013, (2) that Plaintiff could return to work with no limitations by that date, and (3) that her restrictions to no work at that time would last 10 weeks and would end on that same date. (*Id.* at 54-56.) The final evidence regarding permanence was the initial LTD review sent to the LTD Committee, in which Cruz stated that, although Plaintiff was currently disabled, the evidence did not support a finding of permanent disability. (*Id.* at 58-59.)

Thus, the only evidence that Plaintiff was permanently disabled is Dr. Pinner's January 7, 2013 report, which is internally inconsistent and ambiguous. In such circumstances, Defendant's determination that Plaintiff's disability was not permanent, as that term was interpreted, is neither unreasonable nor unsupported by substantial evidence. *See Mullins v. AT & T, Corp.*, 424 F. App'x 217, 223 (4th Cir. 2011) ("Resolving . . . conflicts in the opinions of [an employee]'s treating physicians was [plan administrator]'s responsibility and well within the discretion conferred to it under the terms of the LTD Plan"); *Elliott v. Sara Lee Corp.*, 190 F.3d 601, 606 (4th Cir. 1999) ("[I]t is not an abuse of discretion for a plan fiduciary to deny disability pension benefits where conflicting medical reports were presented."). The materials that Defendant considered sufficiently

15

supported its decision to deny Plaintiff's LTD claim, and, thus, this factor weighs in Defendant's favor.

### 3. Whether the fiduciary's interpretation was consistent with other provisions in the plan

Plaintiff argues in passing that Defendant's decision to deny LTD benefits on the basis of the provision regarding permanence is inconsistent with another provision of the Plan. Plaintiff points out that the Plan provides that employees "may be asked to re-certify that [they] continue to be eligible for LTD Benefits as often as is deemed necessary by the Plan Administrator" and "at least every two years." (ECF No. 17-4 at 27, 30.) Plaintiff argues that denying LTD benefits *ex ante* on the basis that the disability is not permanent is unreasonable when this separate provision of the Plan provides a method for denying LTD benefits when it is determined *post hoc* that the disability is not permanent. (ECF No. 18 at 9.)

This argument is a non-starter. The provisions are not inconsistent; they work in tandem to prevent employees with non-permanent disabilities from receiving LTD benefits. The *ex ante* barrier to LTD benefits precludes those employees who present insufficient evidence that their disability is permanent. This is sensible, as employees who lack the requisite evidence should receive STD benefits until they obtain evidence of permanent disability. The *post hoc* barrier is present because it is not possible to know with certainty *ex ante* whether a disability that a physician determined was permanent is in fact so or will remain so in the future. Because the two provisions are not inconsistent, this factor does not weigh in Plaintiff's favor.

### 4. Whether the decisionmaking process was reasoned and principled

Plaintiff contends that Defendant's decisionmaking was unreasonable and unprincipled because the medical evidence showed that she was totally disabled, because Dr. Pinner stated that Plaintiff was permanently disabled, because a separate Plan provision would permit Defendant to

16

make a *post hoc* determination of whether Plaintiff's disability was permanent, and because Defendant's own decisionmakers admitted that Plaintiff was unable to perform her job duties. (*Id.* at 7-11). These arguments were rejected above, and the court rejects them here. Further, as the court also outlined above, Defendant's decisions were not unreasonable applications of the provisions of the Plan that are at issue in this case. Accordingly, this factor weighs in Defendant's favor.

The only applicable *Booth* factors either weigh in Defendant's favor or do not weigh in Plaintiff's favor. For these reasons, the court concludes that Defendant's decision was the result of a deliberate, principled reasoning process, was supported by substantial evidence, and was thus not an abuse of discretion. Accordingly, Plaintiff's LTD claim must be denied.

## B. Attorney's fees and costs

Under § 1132(g), the court in its discretion may grant reasonable attorney's fees and costs of an ERISA action. 29 U.S.C. § 1132(g). In *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242 (2010), the Supreme Court held that an ERISA claimant "need not be a 'prevailing party' to be eligible for an attorney's fees award." 560 U.S. at 254. Instead, a court may award a non-prevailing ERISA claimant attorney's fees if it shows "some degree of success on the merits." *Id.* at 255 (quotation marks omitted). The court concludes that Plaintiff has not made the requisite showing. Accordingly, Plaintiff's claim for attorney's fees and costs must be denied.

## III. CONCLUSION

For the foregoing reasons, the court finds that Defendant did not abuse its discretion in denying Plaintiff's claim for LTD benefits under the Plan. The court also finds that Plaintiff has not shown some degree of success on the merits and, therefore, is not entitled to an award of

attorney's fees and costs. Accordingly, the court **DIRECTS** entry of judgment in favor of Defendant.

    **IT IS SO ORDERED**.

*J. Michelle Childs*

United States District Court Judge

October 14, 2016
Columbia, South Carolina